IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TWIN CITY IRON WORKERS HEALTH AND WELFARE FUND, on behalf of itself and all others similarly situated, | Civil Action No. _____ |
| | CLASS ACTION |
| Plaintiff, | JURY TRIAL DEMANDED |
| v. | |
| TEVA PHARMACEUTICALS USA, INC., a Delaware corporation, TEVA PHARMACEUTICAL INDUSTRIES LIMITED, an Israeli corporation, BARR PHARMACEUTICALS INC., a Delaware corporation, BARR LABORATORIES INC., a Delaware corporation, DURAMED PHARMACEUTICALS INC. (n/k/a TEVA WOMEN'S HEALTH INC.), a Delaware corporation, DURAMED PHARMACEUTICALS SALES CORP., a Delaware corporation, BOEHRINGER INGELHEIM PHARMA GMBH & CO. KG, a German limited partnership, BOEHRINGER INGELHEIM INTERNATIONAL GMBH, a German limited liability company, and BOEHRINGER INGELHEIM PHARMACEUTICALS, INC., a Delaware corporation, | |
| Defendants. | |

## CLASS ACTION COMPLAINT

Plaintiff, Twin City Iron Workers Health and Welfare Fund, on behalf of itself and all others similarly situated, files this Class Action Complaint ("Complaint") against Defendants Teva Pharmaceuticals USA, Inc., Teva Pharmaceutical Industries Limited, Barr Pharmaceuticals Inc., Barr Laboratories Inc., Duramed Pharmaceuticals Inc. (a/k/a Teva Women's Health Inc.),

Duramed Pharmaceuticals Sales Corp., Boehringer Ingelheim Pharma Gmbh & Co. Kg,

Boehringer Ingelheim International Gmbh, and Boehringer Ingelheim Pharmaceuticals, Inc.,

(collectively "Defendants").  Plaintiff alleges as follows based on: (a) personal knowledge as to

facts relating to itself; (b) the investigation of its counsel; and (c) information and belief.

I.      NATURE OF THE CASE

1.      This is a class action, alleging violation of civil antitrust laws on behalf of a Class

of indirect purchasers of the drug Aggrenox since August 14, 2009.  Defendant Boehringer

Ingelheim Pharmaceuticals, Inc. and its affiliates ("Boehringer") developed Aggrenox, which

combined extended-release dipyridamole with acetylsalicylic acid (aspirin) to lower the risk of

stroke in patients whose blood clots have caused a transient ischemic attack or stroke.

2.      Plaintiff and members of the Class purchased, reimbursed or otherwise paid for

Aggrenox at a time when Boehringer orchestrated a scheme to prevent Plaintiff and the Class

from purchasing a less expensive, generic equivalent of Aggrenox.  Boehringer conspired with

certain generic pharmaceutical manufacturers to pay them not to produce and sell a generic

equivalent of Aggrenox.  Plaintiff and members of the Class seek an order awarding them

damages and enjoining Defendants' anticompetitive conduct.

3.      In December 1999, armed with a patent for its development, Boehringer began

marketing and selling Aggrenox.  Over time, Aggrenox sales increased and were very profitable

for Boehringer, reaching $366 million in 2008.  Anticipating the expiration of Boehringer's

patent, however, in January 2007 Barr Pharmaceuticals. Inc. ("Barr") submitted an application

for regulatory approval to manufacture and market generic Aggrenox.

4. To delay the substantial loss of profits it would suffer from a competing generic equivalent, Boehringer negotiated and executed an exclusion payment agreement - a "pay-for-delay" agreement - with Barr. Under its terms, Barr agreed to delay until July 2015 manufacturing and marketing generic Aggrenox in exchange for a co-promotion agreement worth an estimated $120 million in one-time and yearly royalty payments - far exceeding the value of the services Barr provided plus Barr's agreement not to compete with Boehringer's own authorized generic Aggrenox product.

5. This illegal agreement between Boehringer and Barr delayed the market entry of less expensive generic equivalents of Aggrenox. As a direct result of Defendants' pay-for-delay agreement, Plaintiff and the members of the Class have paid far more for Aggrenox than they would have had Boehringer allowed Barr to manufacture and market a generic equivalent. Defendants' anti-competitive conduct has illegally inflated their profits from Aggrenox, in turn inflating the prices that Plaintiff and members of the Class paid.

6. On behalf of the Class, Plaintiff seeks a judgment declaring that Boehringer's exclusion payment agreement with Barr is unlawful under Section I of the Sherman Act, 15 U.S.C. § I. Plaintiff also seeks an injunction pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, because, unless enjoined, the Defendants' unlawful conduct will continue unchecked and Plaintiff will continue to suffer financial harm as a result of Defendants' antitrust violations. Plaintiff also asserts claims for compensatory and treble damages and equitable relief for continuing violations of state antitrust laws and for and unjust enrichment.

## II.   JURISDICTION AND VENUE

7. This Court has jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action involving common questions of law or fact in which the aggregate amount in controversy exceeds $5,000,000, there are more than one hundred members of the proposed

Class, and at least one member of the proposed Class is a citizen of a state different from that of one of the Defendants.

8.       This Court also has jurisdiction over this matter under 15 U.SC. § 26 and 28 U.S.C. §§ 1331 and 1337 because Plaintiff brings claims under section 16 of the Clayton Act, 15 U.S.C. § 26, for injunctive and equitable relief to remedy the Defendants' violations of Section I of the Sherman Antitrust Act, 15 U.S.C. § I.  The Court has supplemental jurisdiction over Plaintiff's pendent state law claims pursuant to 28 U.S.C. § 1367.

9.       This Court has jurisdiction over Defendants because they are present in the United States, do business in the United States, have registered agents in the United States, may be found in the United States, and are otherwise subject to the service of process provisions of 15 U.S.C. § 22.

10.       Venue is appropriate within this district under Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.SC. §1391(b) and (c), because Defendants transact business within this district and because their interstate trade and commerce is carried out in substantial part in this district. In addition, one of the Defendants is headquartered in this district.

III.       PARTIES

A.       Plaintiff

11.       Plaintiff   Twin City Iron Workers Health and Welfare Fund ("Twin City Iron Workers Fund" or "Plaintiff") is a Taft-Hartley fund authorized pursuant to Section 302(c)(5) of the National Labor Relations Act, with its principal place of business in Bloomington, Minnesota, and an employee welfare benefit plan as defined in Section 3(1) of ERISA.  Twin City Iron Workers Fund provides health benefits, including prescription drug benefits, to approximately 1,850 active participants and retirees, plus their spouses and dependents.  Twin City Iron Workers Fund purchased and/or provided reimbursement for some or all of the

purchase price of Aggrenox, other than for re-sale, in Minnesota and Wisconsin, among other locations, between August 14, 2009 and the present, at supra-competitive prices.  As a direct result of its Aggrenox purchases during the Class Period, Twin City Iron Workers Fund has been injured, paying more than it would have absent Defendants' unlawful scheme to delay the entry of generic equivalents of Aggrenox onto the market.

**B.    Defendants**

12.    Defendant Teva Pharmaceuticals USA, Inc., a wholly-owned subsidiary of Teva Pharmaceuticals Industries Limited, is a Delaware corporation with its principal place of business at 1090 Horsham Road, North Wales, Pennsylvania. It manufactures and distributes generic drugs for sale throughout the United States at the direction, under the control, and for the direct benefit of its parent company.

13.    Defendant Teva Pharmaceuticals Industries Limited is a corporation organized and existing under the laws of Israel, with its principal place of business at 5 Basel Street, Petach Tikva, Israel. Teva is a leading manufacturer of generic drugs, and is one of the largest sellers of generic drugs in the United States.

14.    Defendant Barr Pharmaceuticals Inc. is a corporation organized under the laws of the state of Delaware, with its principal place of business at 400 Chestnut Ridge Road, Woodcliff Lake, New Jersey.  Teva purchased Barr Pharmaceuticals Inc. on December 23, 2008.

15.    Defendant Barr Laboratories, Inc. is a corporation organized under the laws of the state of Delaware, with its principal place of business at 400 Chestnut Ridge Road, Woodcliff Lake, New Jersey. On December 23, 2008, Barr became a wholly-owned subsidiary of Teva.

16.    Defendant Duramed Pharmaceuticals Inc. is a corporation organized under the laws of the state of Delaware, with its principal place of business at 400 Chestnut Ridge Road, Woodcliff Lake, New Jersey.  Until 2008, Duramed was a subsidiary of Barr. In December 2008,

when Teva purchased Barr, Duramed became a subsidiary of Teva and is now known as Teva Women's Health Inc.

17.     Defendant Duramed Pharmaceuticals Sales Corp. is a corporation organized under the laws of the state of Delaware, with a principal place of business at 400 Chestnut Ridge Road, Woodcliff Lake, New Jersey. It was a subsidiary of Barr until December 2008, when it became a subsidiary of Teva.

18.     Defendant Boehringer Ingelheim Pharma GmbH & Co. KG is a limited partnership organized and existing under the laws of Germany, with its principal place of business at Binger Strasse 173, 55216 Ingelheim, Germany.

19.     Defendant Boehringer Ingelheim International GmbH is a limited liability company organized and existing under the laws of Germany, having a principal place of business at Binger Strasse 173, 55216 Ingelheim, Germany.

20.     Defendant Boehringer Ingelheim Pharmaceuticals, Inc. is a Delaware corporation with its principal place of business at 900 Ridgebury Road, Ridgefield, Connecticut.

21.     All of the Defendants' actions described in this complaint are part of, and were in furtherance of, the illegal restraint of trade alleged herein, and were authorized, ordered, and performed by the Defendants' various officers, agents, employees, or other representatives while actively engaged in the management of the Defendants' affairs, within the course and scope of their duties and employment, and with the actual, apparent or ostensible authority of the Defendants.

## IV.   BACKGROUND

### A.   Generic Drugs Benefit Purchasers

22.   The availability of generic drugs has been one of the most effective means of lowering the cost of prescription drugs.  Generic drugs, which also must be approved by the FDA, have the same active chemical composition and provide the same therapeutic effects as the pioneer brand-name drugs upon which they are modeled.  The FDA will assign an "AB" rating to generic drugs that are bioequivalent to pioneer or brand-name drugs.

23.   To be deemed a therapeutic equivalent and assigned an "AB" rating by the FDA, the generic drug must contain the same active ingredient(s); dosage form and route of administration; and strength as the brand name drug.  If so, the generic drug, as a therapeutic equivalent, can be substituted (and in some instances must be substituted) for the pioneer or brand-name drug at the pharmacy dispensing the drug.

24.   Generic drugs are normally priced substantially below the brand-name drugs to which they are bioequivalent.  A 1998 study conducted by the Congressional Budget Office (the "CBO") concluded that generic drugs save consumers and third-party payors between $8 billion and $10 billion a year.  A report prepared by the Government Accounting Office in August 2000 observed, "Because generic drugs are not patented and can be copied by different manufacturers, they often face intense competition, which usually results in much lower prices than brand-name drugs."

25.   The Federal Trade Commission ("FTC") estimates that the first generic manufacturer to enter the market typically charges between 70% and 80% of the price of the brand-name drug.  As additional manufacturers bring generic versions of the drug to market, the price continues to drop.

26.     A brand-name drug loses a significant portion of its market share to generic competitors soon after the introduction of generic competition, even if the brand-name manufacturer lowers prices to meet competition.  The 1998 CBO study estimates that generic drugs capture at least 44% of the brand-name drug's market share in just the first year of sale.

**B.      The FDA Approval Process**

27.     Under the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq.* (the "Act"), approval by the FDA is required before a company may begin selling a new drug.  Pre-market approval for a new drug, often referred to as a "pioneer" or "brand-name" drug, must be sought by filing a New Drug Application ("NDA") with the FDA, demonstrating that the drug is safe and effective for its intended use.  New drugs that are approved for sale in the United States by the FDA are typically (but not necessarily) covered by patents, which provide the patent owner with the exclusive right to sell that new or pioneer drug in the United States for the duration of the patents involved, plus any extension of the original patent period (the "FDA Exclusivity Period") granted pursuant to the Drug Price Competition and Patent Term Restoration Act of 1984, 98 Stat. 1585, 21 U.S.C. § 355 ("Hatch-Waxman Act").

28.     In addition to information on safety and efficacy, NDA applicants must submit to the FDA a list of all "prior art," as well as patents that claim the drug for which FDA approval is being sought or that claim a method of using the drug and with respect to which a claim of patent infringement could reasonably be asserted.  "Prior art" is the term used in patent law to refer to that body of previous knowledge and technology against which a patent application is judged to determine whether the claim is sufficiently novel to merit patent protection.  When the NDA is approved, the FDA "shall publish" the patent information submitted by the NDA applicant.  21 U.S.C. § 355(b)(1).

29.     Once the NDA is approved, the FDA lists any patents referenced as part of the NDA application process in a publication known as the *Approved Drug Products With Therapeutic Equivalence Evaluations*.  This publication is commonly called the "Orange Book." In listing patents in the Orange Book, the FDA merely performs a ministerial act.  The FDA does not check the facts supplied to it by the brand name manufacturer, but trusts that the manufacturer will be truthful.

30.     Once the safety and effectiveness of a new drug is approved by the FDA, it may be used in the United States only under the direction and care of a physician who writes a prescription, specifying the drug by name, which must be dispensed by a licensed pharmacist. The pharmacist must, in turn, fill the prescription with the drug brand specified by the physician, unless an AB-rated generic version of that pioneer drug which has been approved by the FDA is available.

**C.     The Government Encourages and Facilitates the Approval Of Generic Drugs Through the Hatch-Waxman Amendments**

31.     As stated above, generic drugs are drugs that the FDA has found to have the same active chemical composition and provide the same therapeutic effects as the pioneer, brand-name drugs.  Where a generic drug is completely equivalent to a pioneer or brand-name drug, the FDA assigns the generic drug an "AB" rating.

32.     If a generic version of a brand-name drug exists and the physician has not specifically indicated on the prescription "DAW" or "dispense as written" (or similar indications, the wording of which varies slightly from state to state), then: (a) for consumers covered by most insurance plans, the pharmacist will substitute the generic drug; and (b) for consumers whose purchases are not covered by insurance plans, the pharmacist will offer the consumer the choice of purchasing the branded drug, or the AB-rated generic at a lower price.

33.     Once a physician writes a prescription for a brand-name drug, such as for Aggrenox, that prescription defines and limits the market to the drug named or its AB-rated generic equivalent.  Only drugs which carry the FDA's AB generic rating may be substituted by a pharmacist for a physician's prescription for a brand-name drug.

34.     Congress enacted the Hatch-Waxman Act in 1984 to establish an abbreviated process to expedite and facilitate the development and approval of generic drugs.  Consumers benefit from the choice and competition.  To effectuate its purpose, the Hatch-Waxman Act permits a generic drug manufacturer to file an Abbreviated New Drug Application ("ANDA"), which incorporates by reference the safety and effectiveness data developed and previously submitted by the manufacturer of the original, pioneer drug.  The Hatch-Waxman Act also provides an economic incentive to the first ANDA filer for a particular generic drug: a 180-day statutory period of market exclusivity, during which time the manufacturer has the right to market its drug free from competition from other generic manufacturers.

35.     The ANDA must include information concerning the applicant's position *vis-a-vis* the patent that the pioneer drug manufacturer claims applies to the drug.  Therefore, the ANDA filer must make one of four certifications:

(a)     that no patent for the pioneer drug has been filed with the FDA (a "Paragraph I Certification");

(b)     that the patent for the pioneer drug has expired (a "Paragraph II Certification");

(c)     that the patent for the pioneer drug will expire on a particular date and the generic company does not seek to market its generic product before that date (a "Paragraph III Certification"); or

10

      (d)     that the patent for the pioneer drug is invalid or will not be infringed upon

by the proposed generic company's product (a "Paragraph IV

Certification").

21 U.S.C. § 355(j)(2)(A)(vii).  In the case of a patent that has not yet expired, the ANDA

applicant's only certification options are Paragraph III or IV Certifications.

     36.    If the ANDA contains a Paragraph IV Certification, the ANDA applicant must

provide notice to the owner of each patent that is referred to in the certification, and to the holder

of the approved NDA to which the ANDA refers.  *See* 21 U.S.C. § 355(j)(2)(B)(I).  The notice

must include a detailed statement of the factual and legal basis for the ANDA applicant's

assertion that the patent is not valid or will not be infringed by the generic product.  *See id.*; 21

C.F.R. § 314.95.

     37.    The brand-name drug patent owner, upon receiving a Paragraph IV Certification

from an ANDA applicant, has 45 days to initiate a patent infringement suit against the applicant.

*See* 21 U.S.C. § 355(j)(5)(5)(iii).  If no action is initiated within 45 days, the process for FDA

approval of the generic product is not delayed by patent issues.  However, if a patent

infringement suit is brought within the 45-day window, FDA approval of the ANDA is

automatically postponed until the earliest of the expiration of the patents, the expiration of 30

months from the patent holder's receipt of notice of the Paragraph IV Certification, or a final

judicial determination of non-infringement.

     38.    Accordingly, brand-name drug patent holders need only to file a patent

infringement lawsuit within 45 days of receipt of Paragraph IV Certification in order to

automatically block an ANDA applicant's generic drug from entering the market for up to 30

months.

39.     An improper Orange Book listing also has additional anti-competitive effects because the first generic company to file an ANDA with a Paragraph IV Certification is, upon FDA approval, granted a 180-day period of exclusivity in relation to other generic manufacturers.  21 U.S.C. § 355(j)(5)(B)(iv).  This 180-day exclusivity against other generic competitors is awarded to the first Paragraph IV filer regardless of whether or not the brand company institutes pre-approval patent infringement litigation in response to the Paragraph IV certification.  Absent an improper Orange Book listing, no Paragraph IV certification would be required and, thus, no generic company would receive 180-day exclusivity.

40.     Hatch-Waxman also provides brand name manufacturers with other opportunities to obtain protection from generic competition.  For example, if the FDA approves an NDA involving a new chemical entity ("NCE"), the brand manufacturer filing the NDA may obtain five years of exclusivity from the date of approval of the NDA.   In addition, if an NDA drug treats a rare condition, the FDA may, if appropriate, grant an additional two years of "Orphan Drug" exclusivity.

## D.     Brand Name Manufacturers Game the Regulatory Structure

41.     Because of the FDA rules alleged above, brand name manufacturers have an incentive to: (a) list patents in the Orange Book, even if such patents are not eligible for listing; and (b) then sue any generic competitor that files an ANDA with paragraph IV certification, even if such competitor's product does not actually infringe the listed patent(s), in order to delay final FDA approval of an ANDA for up to 30 months.  In addition, prior to a recent change in the Hatch-Waxman regulations, brand companies could, and did, bring multiple infringement suits (based on multiple patents listed in the Orange Book) against a single ANDA, thereby obtaining independent 30-month stays associated with each suit.  This practice was curtailed by a change in

FDA regulations mandated by the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, which, due to repeated abuses by brand manufacturers of the type described here, limited brand manufacturers to a single stay per ANDA. *See* 21 C.F.R. §§ 314.52, 314.95, 314.107(b)(3)(i)(A).

> **E.    No-Authorized-Generic Agreements**

42.    The l80-day marketing exclusivity to which first-filer generics may be entitled does not prevent a brand manufacturer from marketing its own generic alternative to the brand drug during that l80-day period.  Such an "authorized generic" is chemically identical to the brand drug, but is sold as a generic product through either the brand manufacturer's subsidiary (if it has one) or through a third-party generic manufacturer.  While competition from an authorized generic during the 180-day exclusivity period substantially reduces the first-filer's revenue, it also substantially reduces drug prices for consumers.

43.    In its recent study, Authorized Generic Drugs: Short-term Effects and Long-Term Impact (August 2011) (the "FTC Study"), the Federal Trade Commission found that authorized generics capture a significant portion of sales, reducing the first-filer generic's revenues by approximately 50% on average during the 180-day exclusivity period.  The first-filing generic makes significantly less money when it faces competition from an authorized generic because (1) the presence of an additional generic in the market causes prices to decrease; and (2) the authorized generic takes a large share of unit sales away from the first filer.

44.    Although first-filing generic manufacturers make significantly less money when they must compete with an authorized generic during the first 180 days, consumers and other drug purchasers, such as Plaintiff and the End-Payor Class, benefit from the lower prices caused by competition between the authorized generic and the first-filing generic.

45.     Given the significant negative effect of an authorized generic on the first-filing generic's revenues, a brand manufacturer's agreement not to launch an authorized generic has tremendous value to the generic manufacturer. Brand manufacturers have used such agreements as a way to pay the first-filer to delay entering the market.  Such non-competition agreements deprive consumers and other drug purchasers, such as Plaintiff and the End-Payor Class, of the lower prices resulting from two forms of competition: (1) among the branded and the generic products; and (2) between the generic products.

46.     Agreements not to compete with an authorized generic can take many forms. According to the FTC Study, one such form includes agreements whereby the brand name manufacturer agrees to supply the first-filing generic with the authorized generic product exclusively.  The result is no competition between an authorized generic and the first-filing generic's product for a period of time.

## V.     THE AGGRENOX PAY-FOR-DELAY AGREEMENT

### A.     Boehringer Starts Marketing Aggrenox in December 1999

47.     Boehringer developed Aggrenox as a treatment to lower the risk of stroke in patients who have had a transient ischemic attack (also known as a 'mini stroke') or stroke due to a blood clot.  A transient ischemic attack is similar to a stroke, except it usually lasts only a few minutes and does not result in permanent damage.

48.     Aggrenox is a single gelatin capsule containing 200mg of extended-release dipyridamole and 25mg of immediate-release acetylsalicylic acid (aspirin).  Boehringer has previously marketed dipyridamole as a stand-alone drug under the brand name Persantine to prevent clots from forming after heart valve replacements and aspirin has previously been prescribed for the prevention of strokes.

14

49.     Boehringer submitted Patent No. 6,015,577 (the "'577 Patent") to the FDA for listing in the Orange Book. This patent was for a composition of dipyridamole and acetylsalicylic acid for oral administration.  The '577 Patent is scheduled to expire on January 18, 2017.  Boehringer also filed NDA 020884 for Aggrenox and on November 22, 1999 received FDA approval to market Aggrenox to help reduce the risk of repeat strokes.

50.     Boehringer began marketing Aggrenox in December 1999.  Aggrenox was the only prescription drug for reducing the risk of subsequent stroke through a single aspirin and extended-release dipyridamole capsule.  Studies submitted to the FDA by Boehringer showed that Aggrenox's combined dipyridamole-aspirin formulation is more effective at reducing the risk of future stroke than administration of either ingredient on its own.

51.     Aggrenox quickly became a commercial success and a steady source of profits for Boehringer.  By 2008 Aggrenox sales in the United States had reached $366 million per year.

**B.     Barr Seeks FDA Approval to Market a Generic Equivalent to Aggrenox**

52.     On January 31, 2007, Barr submitted ANDA 78-804 to the FDA, seeking approval to market a generic equivalent of Aggrenox. It submitted amendments to its ANDA on May 30, August 10, and November 14, 2007; June 6, August 25, and August 26, 2008; and July 1, July 13, July 14, and July 20, 2009.  Barr was the first generic manufacturer to submit a substantially complete ANDA for generic Aggrenox with a Paragraph IV certification for the '577 Patent.

53.     On May 31, 2007, Barr notified Boehringer that it had submitted ANDA 78-804 and a Paragraph IV certification regarding the '577 Patent, asserting that its generic would not infringe the patents and/or that the patents were invalid or unenforceable.

54.     On July 11, 2007, Boehringer sued Barr for patent infringement in the United States District Court for the District of Delaware. Boehringer's lawsuit triggered the 30-month

15

stay that, under the Hatch-Waxman Amendments, prohibited the FDA from granting final approval of Barr's ANDA.

55.     Barr denied the allegations in Boehringer's complaint, and counterclaimed for declaratory relief of non-infringement, invalidity, and unenforceability of the '577 Patent.  Barr argued that Boehringer had misrepresented to the U.S. Office of Patents and Trademarks ("USPTO") the nature and materiality of a prior patent - Patent No. 5,694,024 - and its related reference DE-AI-3,515,874.  According to Barr, the properly disclosed patent and reference would have made the claims of the '577 Patent obvious.  In light of these allegations, Barr asked the District Court to find the '577 Patent unenforceable.  The patent lawsuit continued until August 2008 without any substantive rulings.

### C.     Boehringer and Barr Enter Into the Exclusion Payment Agreement

56.     On August 11, 2008, Boehringer and Barr announced that they had settled the patent litigation.  On August 13, 2008, Boehringer and Barr filed a stipulation seeking dismissal of the patent litigation with prejudice in light of the settlement.  The Court entered the stipulation and dismissed the case the next day.

57.     Under the terms of the settlement, Boehringer and Barr agreed that Barr would delay launching a generic equivalent of Aggrenox until at least July 1, 2015.  The agreement unlawfully maintained Boehringer's exclusive right to sell Aggrenox, and that Boehringer and Barr would share the revenue Boehringer derived as a result of its exclusivity (the "Exclusion Payment Agreement").

58.     The Exclusion Payment Agreement between Boehringer and Barr had several components:

a.     Settlement Agreement.  Boehringer and Barr agreed to dismiss all claims and counterclaims in the patent litigation and Barr agreed to delay launching a generic version of Aggrenox until July 1, 2015.

b.     Authorized Generic License.  By granting Barr a license to market an authorized generic version of Aggrenox under Boehringer's NDA, Boehringer agreed not to compete against Barr with Boehringer's own authorized generic Aggrenox product.  Absent the agreement, Boehringer had the incentive and ability to launch an authorized generic version of Aggrenox.  The intended result of the agreement was that Barr would have a de facto 180-day exclusivity for generic Aggrenox regardless of whether it was statutorily entitled to such exclusivity, and that there would be no competition between Barr's product and Boehringer's authorized generic product during the 180 days of exclusivity and beyond.  This aspect of the agreement provides substantial compensation to Barr, which can expect to make approximately double the unit sales, at a much higher price, absent an authorized generic in the market. These higher prices come at the expense of Plaintiff and the End-Payor Class.

c.     Co-Promotion Agreement.  Boehringer agreed to pay Barr (through its subsidiary) for co-promotion services related to sales of Aggrenox.  Boehringer agreed to train Duramed's 93-person Specialty Sales Force to promote Aggrenox to obstetricians, gynecologists, and women's health care professionals, beginning in March 2009 and continuing until Barr's generic product entered the market.  In exchange, Boehringer agreed to pay Barr a one-time fee plus annual, increasing royalties on the total U.S. Aggrenox sales for a period of years. The total value of these payments is an estimated $120 million.

59.     Under the Exclusion Payment Agreement, Boehringer agreed to pay Barr in exchange for Barr's agreement to delay the entry date of its generic Aggrenox-equivalent.  In

litigation with the Federal Trade Commission ("FTC") regarding the agency's investigation of Boehringer and Barr's agreements, Boehringer's counsel admitted that the Co-Promotion Agreement was the means by which Boehringer paid Barr to drop its patent challenge and delay its launch of generic Aggrenox. He described it as "part and parcel of the settlement. It was part of the flow of compensation. It was part of the consideration of the settlement, so it is really a mischaracterization or misdescription to say that we said it was stand alone."

60.     At other points, Boehringer's counsel explained that:

a.     The Settlement Agreement and Co-Promotion Agreement "were executed together. The evidence is replete that [the co-promotion agreement was] part of the settlement'" and

b.     "We have always said that the Aggrenox co-promote was part of the settlement. It had - It absolutely was."

61.     The Co-Promotion Agreement was not a stand-alone business transaction, as evidenced by Boehringer's payments under the co-promotion agreement vastly exceed the value of the services provided by Barr and its subsidiaries.

62.     According to Boehringer's own counsel, documents related to the Co-Promotion Agreement "provide a blueprint for how a company can extract settlement payments out of not only our client, but virtually every branded pharmaceutical company."

**D.     Teva Acquires Barr and Continues the Scheme**

63.     On December 23, 2008, Teva acquired Barr and Barr's rights and responsibilities under the Exclusion Payment Agreement. Teva has continued to stay out of the market with a generic Aggrenox. Teva thus joined the ongoing unlawful course of conduct - and joined the unlawful agreements, collusion and conspiracy - to suppress generic competition of Aggrenox. Teva did not withdraw from the conspiracy, and instead continued to participate in it.

64.     As a result of its acquisition of Barr, Teva would own (either directly or indirectly) ANDA 78-804 and the 180-day exclusivity period that Barr may be entitled to as the first filer.

65.     Post-acquisition, Teva/Barr continued to pursue approval of ANDA 78-804.  On August 14, 2009 the FDA granted final approval of ANDA 78-804 for a generic equivalent of Aggrenox, and noted that Teva/Barr may have forfeited its 180-day exclusivity for failing to receive tentative approval within the requisite 30 months.  Because of the Exclusion Payment Agreement, no generic equivalent of Aggrenox is on the market and none will be until July 1, 2015.

**E.     The Unlawful Agreement to Suppress Generic Competition Is Ongoing and Continues to Cause Harm**

66.     Currently, no generic equivalent of Aggrenox is available in the U.S.  Another generic manufacturer has filed an ANDA for generic Aggrenox that includes a Paragraph IV certification for the '577 Patent, but the 30-month stay will not conclude prior to July 2015.  No generic Aggrenox product will enter the market prior to July 2015.  If Teva is found eligible for 180 days of marketing exclusivity and launches a generic equivalent of Aggrenox on July 1, 2015, the earliest another company can introduce a generic equivalent of Aggrenox is December 2015.

67.     The lack of generic competition is the direct result of the ongoing unlawful agreement that began in 2008, and will continue at least through July 1, 2015.  Boehringer continues to sell brand name Aggrenox at artificially inflated prices.

68.     During the four-year period prior to the filing of this complaint, the Defendants' unlawful conduct was ongoing and the Plaintiff and Class members were injured every day that the Defendants' unlawful agreement was in place.

69.     But for the anticompetitive, illegal, and ongoing conduct alleged in this complaint, Plaintiff and the Class members would have had access to less expensive versions of Aggrenox much sooner.  The Defendants have injured Plaintiff and the Class members by causing them to pay hundreds of millions of dollars of overcharges on their purchases of Aggrenox.

**F.     The Federal Trade Commission Opens an Investigation Into the Exclusion Payment Agreements**

70.     On January 15, 2009, the FTC issued a Resolution Authorizing Use of Compulsory Process in Nonpublic Investigation to determine "whether Boehringer Ingelheim Pharmaceuticals, Inc. and Barr Pharmaceuticals, Inc., and their affiliates, or any other person, has engaged or is engaging in unfair methods of competition ... with respect to the sale of Aggrenox or its generic equivalents and Mirapex and its generic equivalents." FTC File No. 091-0023; *see Federal Trade Commission v. Boehringer Ingelheim Pharmaceuticals, Inc.*, Case No. 1:09-mc-00564-JMF, Dkt. # 1-1, at 3 (D.C.).  As the FTC explained, "[c]ompensation rarely takes the form of explicit cash payments; instead, the settling firms typically include the payment in a separate business deal executed simultaneously with the settlement."  Case No. 12-5393 (D.C. Cir.), Brief of Appellant Federal Trade Commission, Doc. #1444255, p. 9 ("FTC Brief").

71.     Pursuant to Sections 3 and 9 of the FTC Act, 15 U.S.C. §§ 43 and 49, on February 5, 2009 the FTC issued a subpoena to Boehringer seeking 37 categories of documents, including documents related to the settlements of the Aggrenox litigation and the Co-Promotion Agreement. The FTC subpoena seeks - and Boehringer has refused to provide - its internal financial analysis regarding whether the payments Boehringer made to Barr under the Co-Promotion Agreement were for promotional services alone, or "side-payments for an

anticompetitive agreement to delay generic entry and share the ensuing monopoly profits." FTC Brief, at p. 2.

72.     Boehringer refused to produce documents that would support its claim or substantiate its assertion that the Co-Promotion Agreement provided Boehringer with substantial value aside from the benefits it derived from delaying generic competition for Aggrenox.  In response, the FTC filed a petition to enforce the subpoena.  The FTC's petition did not specify the size of the payments from Boehringer to Barr under the Co-Promotion Agreement.

73.     On December 12, 2012, after the District Court had determined that Boehringer's internal financial analyses regarding the Co-Promotion Agreement were privileged and in large part denied the FTC's petition, the agency filed a Notice of Appeal with the United States Court of Appeals for the District of Columbia.

74.     While Boehringer has not provided the FTC with its internal financial analyses, the FTC is in possession of the terms of the Co-Promotion Agreement.  Based on this information, the FTC described the payments under the Co-Promotion Agreement as a "significant financial transaction." *Id.* at 36, n. 12.  In a June 28, 2013 brief to the United States Court of Appeals for the District of Columbia, the FTC argued that, "under the agreement, Boehringer agreed to pay Barr a one-time fee plus annual, increasing royalties on the total U.S. Aggrenox sales for a period of years. . . In 2008, Aggrenox had total U.S. sales of about $366 million… At this level of sales, the FTC estimates that the deal would ultimately cost Boehringer over $120 million in royalties." *Id.*  The litigation and the FTC's investigation are ongoing.

## VI.    MARKET CHARACTERISITICS FOR AGGRENOX

75.    At all relevant times, Boehringer has had the power to maintain the price of Aggrenox at monopolistic levels without losing substantial sales to competing generic equivalents.

76.    Aggrenox does not exhibit significant, positive cross-elasticity of demand with respect to price with any product other than an AB-rated generic equivalent of Aggrenox.

77.    Because of its unique profile as a combined aspirin and extended-release dipyridamole treatment for subsequent strokes, Aggrenox is differentiated from all products other than AB-rated generic equivalents of Aggrenox.  Aggrenox's specific ratio of dipyridamole to aspirin and the release formulations of those components also differentiate it from products aside from AB-rated generic equivalents.

78.    Boehringer needed to control only Aggrenox (and any AB-rated generic equivalents to Aggrenox), and no other products, to maintain the price of Aggrenox profitably at monopolistic prices.  Only the market entry of a competing AB-rated generic equivalent to Aggrenox would render Boehringer unable to profitably maintain monopolistic prices of Aggrenox without losing substantial sales.

79.    Boehringer also sold branded Aggrenox at prices well in excess of marginal costs and the competitive price, and enjoyed high profit margins.

80.    The Defendants have had and continue to exercise the power to exclude generic competition to branded Aggrenox.

81.    At all relevant times, the Defendants enjoyed high barriers to entry with respect to the market for Aggrenox products.

82.    To the extent that Plaintiff is legally required to define a relevant product market; Plaintiff alleges that the relevant market is all Aggrenox products, which includes Aggrenox and

AB-rated bioequivalent products.  During the relevant time period, Defendants have been able to profitably maintain the price of Aggrenox well above competitive levels.

83.     The relevant geographic market is the United States and its territories.

84.     At all relevant times, Boehringer has had a 100% market share in the relevant market, and will continue to have that market share until July 2015.

### VII. MARKET EFFECTS OF DEFENDANTS' ANTICOMPETITIVE SCHEME

85.     Boehringer began marketing Aggrenox in December 1999.  No generic equivalent of Aggrenox has ever been available for purchase in the United States.  The Defendants' anticompetitive scheme had the purpose and effect of unreasonably restraining and injuring competition by protecting Aggrenox from generic competition.  But for the unlawful Exclusion Payment Agreement: (a) Barr would have entered the market upon receiving final FDA approval or agreed to an unrestrained licensed entry date much earlier than July 1, 2015; and (b) Boehringer would have launched an authorized generic version of Aggrenox simultaneously with the launch of Barr's generic Aggrenox product.

86.     But for the Defendants' illegal conduct, Plaintiff and Class members would have paid less.  The Defendants' conduct directly injured Plaintiff and Class members because it forced them to pay hundreds of millions of dollars in overcharges on their Aggrenox purchases.

87.     As a result of the delay in generic competition brought about by the Defendants' anticompetitive scheme, Plaintiff and Class members paid more for Aggrenox products than they would have paid absent the Defendants' illegal conduct

88.     Barr had extensive experience in the pharmaceutical industry, including experience obtaining approval of ANDAs, manufacturing commercial launch quantities adequate to meet market demand, and marketing generic pharmaceutical products.

23

89.     Upon entering the market, generic equivalents of brand name drugs are priced significantly below the branded drug to which they are AB-rated.  When multiple generic products are on the market, prices for generic equivalents fall even further because of the increased competition.

90.     If generic competition for Aggrenox had not been unlawfully delayed, End-Payors would have paid less for Aggrenox by substituting purchases of less-expensive AB-rated generic equivalents of Aggrenox for their purchases of more-expensive brand Aggrenox.

91.     Thus, the Defendants' unlawful conduct deprived Plaintiff and the Class members of the benefits of competition that the antitrust laws were designed to ensure.

**VIII. ANTITRUST IMPACT OF DEFENDANTS' SCHEME**

92.     During the relevant period, Plaintiff and Class members purchased substantial amounts of Aggrenox indirectly from Boehringer.  As a result of the Defendants' illegal conduct, these purchasers were compelled to pay artificially inflated prices for Aggrenox.  Those prices were substantially higher than the prices that Plaintiff and Class members would have paid absent the illegal conduct alleged in this complaint.

93.     As a consequence, purchasers of Aggrenox have sustained substantial losses and damage to their business and property in the form of overcharges.  The full amount, forms, and components of such damages will be calculated after discovery and upon proof at trial.

94.     Defendants' efforts to restrain competition in the market for Aggrenox have substantially affected interstate and foreign commerce.

95.     At all material times, Boehringer manufactured, promoted, distributed, and sold substantial amounts of Aggrenox in a continuous and uninterrupted flow of commerce across state and national lines and throughout the United States.  Defendants' anticompetitive conduct had substantial intrastate effects in every state of purchase in that, among other things, retailers

within each state were foreclosed from offering cheaper generic equivalents of Aggrenox to purchasers within each state, which directly impacted and disrupted commerce for consumers and third-party payors within each state.

96. At all material times, Defendants transmitted funds and contracts, invoices, and other forms of business communications and transactions in a continuous and uninterrupted flow of commerce across state and national lines in connection with the sale of Aggrenox.

97. Economic theory recognizes that any overcharge at a higher level of distribution generally results in higher prices at every level below. *See* Hovenkamp, Federal Antitrust Policy: The Law of Competition and Its Practice (1994) at 624. Professor Herbert Hovenkamp explains that "[e]very person at every stage in the chain will be poorer" as a result of the anticompetitive price at the top. He also says that "[t]heoretically, one can calculate the percentage of any overcharge that a firm at one distribution level will pass on to those at the next level."

98. The institutional structure of pricing and regulation in the pharmaceutical drug industry ensures that overcharges at the higher level of distribution are passed on to end-payors. Wholesalers and retailers passed on the inflated prices of Aggrenox to Plaintiff and Class members.

99. Defendants' anti competitive conduct enabled Boehringer to indirectly charge consumers and third-party payors prices in excess of what they otherwise would have been able to charge absent the Defendants' unlawful actions.

100. The prices were inflated as a direct and foreseeable result of Defendants' anticompetitive conduct.

101.    The inflated prices that Plaintiff and Class members have paid are traceable to, and the foreseeable result of, the overcharges by Boehringer.

## IX.    CLASS ACTION ALLEGATIONS

102.    Twin City Iron Workers Fund, on behalf of itself and all proposed Class members, seeks injunctive and equitable relief and damages, measured as overcharges, trebled, against the Defendants.

103.    Plaintiff brings this action on behalf of itself and, under Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3), as representative of a Class defined as:

> All persons or entities in the United States and its territories who purchased and/or paid for some or all of the purchase price for Aggrenox, in any form, for consumption by themselves, their families, or their members, employees, insureds, participants, or beneficiaries, other than for resale, from August 14, 2009 through and until the anticompetitive effects of defendants' unlawful conduct cease.

104.    The following persons or entities are excluded from the proposed Class:

a.    Defendants and their counsel, officers, directors, management, employees, subsidiaries, or affiliates;

b.    All governmental entities, except for government funded employee benefit plans;

c.    All persons or entities who purchased Aggrenox for purposes of resale or directly from the defendants or their affiliates;

d.    Fully insured health plans (plans that purchased insurance from another third-party payor covering 100% of the plan's reimbursement obligations to its members);

e.    Flat co-payers (consumers who paid the same co-payment amount for brand and generic drugs); and

f.    The judges in this case and any members of their immediate families.

26

105.    The Class members are so numerous that joinder is impracticable.  There are thousands of Class members, both consumers and health plans.

106.    Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and all Class members were damaged by the same wrongful conduct of the Defendants, in that they paid artificially inflated prices for Aggrenox and were deprived of the benefits of earlier and more robust competition from cheaper generic equivalents of Aggrenox as a result of the Defendants' wrongful conduct.

107.    Plaintiff will fairly and adequately protect and represent the interests of the Class. Plaintiff's interests are not antagonistic to, those of the Class members.

108.    Plaintiff has retained counsel with experience in the prosecution of class action antitrust litigation, and with experience in class action antitrust litigation involving pharmaceutical products.

109.    Questions of law and fact common to the Class members predominate over questions that may affect only individual Class members because Defendants have acted on grounds generally applicable to the entire Class, making overcharge damages with respect to the Class as a whole appropriate.

110.    Questions of law and fact common to all Class members include:

a.    Whether Boehringer entered into a contract, combination, or conspiracy with Barr to restrain trade and, if so, whether it should be evaluated under the rule of per se illegality, the "rule of reason," or some other rule or standard;

b.    Whether Teva joined the unlawful agreement on its own behalf and on behalf of Barr;

27

c.      Whether Defendants unlawfully excluded competitors and potential competitors from the market for Aggrenox;

d.      Whether Defendants unlawfully delayed or prevented generic manufacturers from coming to market in the United States;

e.      Whether Defendants' conduct substantially affected interstate commerce;

f.      Whether, and to what extent, Defendants ' conduct caused antitrust injury to Plaintiff and Class members; and

g.      The aggregate amount of overcharge damages to be awarded to the Class.

111.    Class action treatment is a superior method for the fair and efficient adjudication of this case.  Class treatment will permit a large number of similarly situated, geographically dispersed persons and entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs any potential difficulties in the management of this class action.

112.    Plaintiff knows of no special difficulty to be encountered in litigating its claims that would preclude the maintenance of this case as a class action.

## X.     FRAUDULENT CONCEALMENT TOLLED THE STATUTE OF LIMITATIONS

113.    Plaintiff and Class members had no knowledge of the Defendants' unlawful self-concealing scheme and could not have discovered the scheme and conspiracy through the exercise of reasonable diligence more than four years prior to the filing of this complaint.

28

114.    This is true because the nature of Defendants' conspiracy was self-concealing and because the Defendants employed deceptive practices and techniques of secrecy to avoid detection of, and fraudulently to conceal, their contract, combination, conspiracy, and scheme. Notwithstanding the self-concealing nature of their conspiracy, Defendants and their co-conspirators wrongfully and affirmatively concealed the existence of their continuing combination and conspiracy from Plaintiff and Class members by, among other things:

a.    Concealing the amounts that Boehringer was to pay and paid Barr/Teva under the Exclusion Payment Agreement;

b.    Concealing the fact that the purpose of the payments under the Co-Promotion Agreement was to provide compensation to Barr/Teva in connection with the settlement of the '577 Patent litigation and the entry date for Barr/Teva's generic product;

c.    Concealing the fact that those amounts far exceeded any lawful economic benefit that Boehringer received from Barr/Teva under the agreement; and

d.    Filing documents with the SEC that failed to disclose the existence or nature of the Exclusion Payment Agreement.  Teva's fiscal year 2008 20-F did not mention the settlement of the Aggrenox litigation.  The 20-F mentioned a co-promotion agreement for a different pharmaceutical product, but did not mention the Aggrenox Co-Promotion Agreement. Teva's 20-F filings for the fiscal years 2009, 2010, 2011, and 2012 similarly failed to disclose the Aggrenox settlement or the Co-Promotion Agreement.

115.    Because the alleged conspiracy was both self-concealing and affirmatively concealed by Defendants and their co-conspirators, Plaintiff and Class members had no knowledge of the conspiracy more than four years prior to the filing of this complaint, or of the

facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed.

116.     Plaintiff and Class members also lacked the facts and information necessary to form a good faith basis for believing that any legal violations had occurred, including the amounts of payments made from Boehringer to Barr/Teva under the Co-Promotion Agreement. Reasonable diligence on the part of Plaintiff and Class members would not have uncovered those facts more than four years prior to the filing of this complaint.

117.     As a result of Defendants' fraudulent concealment, all applicable statutes of limitations affecting Plaintiff and Class members' claims have been tolled.

118.     Alternatively, if the statute of limitations is not tolled, this complaint alleges a continuing course of conduct (including conduct within the limitations period), and Plaintiff and Class members can recover damages they suffered during the limitations period.

### XI.     CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**
**For Declaratory and Injunctive Relief**
**Under Section 16 of the Clayton Act**
**for Violations of Section 1 of the Sherman Act**
**(Against All Defendants)**

119.     Plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

120.     The Defendants knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to delay and block entry of AB-rated generic equivalents of Aggrenox.  The intended and accomplished goal of the scheme was to use restrictive and exclusionary conduct to delay Barr and Teva's launch date for the first generic equivalent of Aggrenox.  The Defendants injured Plaintiff and Class members through an agreement to

exclude generic Aggrenox products from the market in exchange for substantial payments to Barr and Teva.

121.     Had manufacturers of generic Aggrenox products entered the market and lawfully competed with Boehringer in a timely fashion, Plaintiff and Class members would have substituted lower-priced generic Aggrenox products for the higher-priced brand name Aggrenox for some or all of their purchases, and would have paid lower net prices on their remaining Aggrenox purchases.

122.     The Defendants intended, and accomplished, a horizontal market allocation of the Aggrenox market, which is a per se violation of Section 1 of the Sherman Act.  By their agreement, the Defendants intentionally and wrongfully conspired and combined in an unreasonable restraint of trade in violation of Section 1 of the Sherman Act.  As a result of this unreasonable restraint on competition, Plaintiff and Class members paid artificially inflated prices for Aggrenox.

123.     Plaintiff and Class members have suffered harm, and will continue to suffer harm in the future as a result of paying higher prices for Aggrenox than they would have absent Defendants' anticompetitive conduct and continuing anticompetitive agreement.  Plaintiff and Class members also face a continuing threat of injury from the unlawful conduct alleged in this complaint.

124.     Plaintiff and Class members have purchased substantial amounts of Aggrenox indirectly from Boehringer.

125.     As a successor in interest to Barr, Teva is liable for all of Barr's anticompetitive conduct in connection with Aggrenox.  And by joining an ongoing unlawful agreement to

restrain trade, Teva is liable for all conduct that occurred prior to the date on which it joined the ongoing unlawful course of conduct.  In addition, Teva is liable for its own unlawful conduct.

126.    Plaintiff and Class members seek a declaratory judgment pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) that the Defendants' conduct violates Section I of the Sherman Act.

127.    Plaintiff and the Class also seek equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by the Defendants' unlawful conduct, and other relief to ensure that similar anticompetitive conduct does not reoccur in the future.

## SECOND CLAIM FOR RELIEF
### For Violation of State Antitrust Laws
### (Against All Defendants)

128.    Plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

129.    In 2008, Boehringer and Barr entered into the Exclusion Payment Agreement to suppress generic competition with Aggrenox. Teva joined and continued the unlawful agreement to suppress generic competition. The Exclusion Payment Agreement was and is a contract, combination, and/or conspiracy that substantially, unreasonably, and unduly restrained trade in the relevant market, the purpose and effect of which was to:

a.    Allocate all sales of Aggrenox in the United States to Boehringer until at least July 1, 2015;

b.    Prevent each of the Defendants from selling a generic equivalent of Aggrenox in the United States until July 1, 2015;

   c. Prevent Boehringer from competing against Barr/Teva with an authorized generic version of Aggrenox once Barr/Teva launches on July 1, 2015;

   d. Fix the price that Plaintiff and Class members paid for Aggrenox; and

   e. Fix the price that Plaintiff and Class members will pay for generic Aggrenox when it is launched on or after July 1, 2015.

130. The Exclusion Payment Agreement has harmed Plaintiff and Class members as set forth above.

131. The Exclusion Payment Agreement has covered a sufficiently substantial percentage of the relevant market to harm competition.

132. The Exclusion Payment Agreement is a horizontal market allocation and price fixing agreement between actual and potential competitors and is illegal per se under state antitrust laws.  Alternatively, Plaintiff alleges that the Exclusion Payment Agreement is an unreasonable restraint of trade, in violation of state antitrust laws.

133. There is and was no legitimate, non-pretextual, pro-competitive business justification for the Exclusion Payment Agreement that outweighs its harmful effect.  Even if there were such a justification, the Exclusion Payment Agreement is and was broader than necessary to achieve any conceivable pro-competitive purpose.

134. The Defendants' conduct violated state antitrust laws.

   a. Arizona Rev. Stat. §§ 44-1402, *et seq.*, with respect to purchases in Arizona by members of the Class.

   b. Cal. Bus. Code §§ 16700, *et seq.*, and Cal. Bus. Code §§ 17200, *et seq.*, with respect to purchases in California by members of the Class.

     c.       D.C. Code Ann. §§ 28-4502, *et seq*., with respect to purchases in the District of Columbia by members of the Class.

     d.       Fla. Stat. §§ 501.201, *et seq*., with respect to purchases in Florida by members of the Class.

     e.       740 Ill. Compo Stat. 10/3, *et seq*., with respect to purchases in Illinois by members of the Class.

     f.       Iowa Code § 553.2 *et seq*., with respect to purchases in Iowa by members of the Class.

     g.       Kan. Stat. Ann. §§ 50-WI, *et seq*., with respect to purchases in Kansas by members of the Class.

     h.       Mass. Gen. L. Ch. 93A, *et seq*. , with respect to purchases in Massachusetts by members of the Class, with thousands of Massachusetts End-Payors paying substantially higher prices for Aggrenox and its generic equivalents in actions and transactions occurring substantially within Massachusetts.

     i.       Me. Rev. Stat. Ann. 10, § 1101, *et seq*., with respect to purchases in Maine by members of the Class.

     j.       Mich. Compo Laws Ann. §§ 445.772, *et seq*., with respect to purchases in Michigan by members of the Class.

     k.       Minn. Stat. §§ 325D.51, *et seq*., with respect to purchases in Minnesota by members of the Class.

     1.       Miss. Code Ann. §§ 75-21-3, *et seq*., with respect to purchases in Mississippi by members of the Class.

m.      Neb. Code Ann. §§ 59-801, *et seq*., with respect to purchases in Nebraska by members of the Class.

n.      Nev. Rev. Stat. Ann. § 598A.060, *et seq*., with respect to purchases in Nevada by members of the Class, in that thousands of sales of Aggrenox took place at Nevada pharmacies, purchased by Nevada end-payors at supracompetitive prices caused by Defendants' conduct.

o.      N.M. Stat. Ann. §§ 57-I-I, *et seq*., with respect to purchases in New Mexico by members of the Class.

p.      New York General Business Law § 340, *et seq*., with respect to purchases in New York by members of the Class.

q.      N.C. Gen. Stat. §§ 75-1, *et seq*., with respect to purchases in North Carolina by members of the Class.

r.      N.D. Cent. Code § 51-08.1-02, *et seq*., with respect to purchases in North Dakota by members of the Class.

s.      Or. Rev. Stat. §§ 646.705, *et seq*., with respect to purchases in Oregon by members of the Class.

t.      10 L.P.R.A. § 251, *et seq*., with respect to purchases in Puerto Rico by members of the Class.

u.      R.I. Gen. Laws §§ 6-36-4 *et seq*., with respect to purchases in Rhode Island by members of the Class.

v.      S.D. Codified Laws Ann. § 37-1-3.2, *et seq*., with respect to purchases in South Dakota by members of the Class.

w.      Utah Code Ann. §§ 76-10-911, *et seq.*, with respect to purchases in Utah by members of the Class.

x.      Tenn. Code Ann. §§ 47-25-101, *et seq.*, with respect to purchases in Tennessee by members of the Class, in that the actions and transactions alleged herein substantially affected Tennessee, with thousands of end-payors in Tennessee paying substantially higher prices for Aggrenox and AB-rated generic equivalents at Tennessee pharmacies.

y.      Vt. Stat. Ann. 9, § 2453, *et seq.*, with respect to purchases in Vermont by members of the Class.

z.      W.Va. Code §§ 47-18-3, *et seq.*, with respect to purchases in West Virginia by members of the Class.

aa.     Wis. Stat. § 133.03, *et seq.*, with respect to purchases in Wisconsin by members of the Class, in that the actions and transactions alleged herein substantially affected the people of Wisconsin, with thousands of end- payors in Wisconsin paying substantially higher prices for Aggrenox at Wisconsin pharmacies.

135.    Plaintiff and Class members have been injured in their business or property by Defendants' antitrust violations.   These injuries are of the type the above antitrust laws were designed to prevent, and flow from that which makes Defendants' conduct unlawful.

136.    As a successor in interest to Barr, Teva is liable for all of Barr's anticompetitive conduct in connection with Aggrenox.  And by joining an ongoing unlawful agreement to restrain trade, Teva is liable for all conduct that occurred prior to the date on which it joined the ongoing unlawful course of conduct.  In addition, Teva is liable for its own unlawful conduct.

137.    Plaintiff and Class members seek damages and multiple damages as permitted by law for the injuries they suffered as a result of the Defendants' anticompetitive conduct.

138.    Defendants are jointly and severally liable for all damages suffered by Plaintiff and Class members.

139.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of the above-listed state antitrust laws.

### THIRD CLAIM FOR RELIEF
### For Unjust Enrichment
### (Against All Defendants)

140.    Plaintiff repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

141.    Defendants have benefited from the overcharges on sales of Aggrenox made possible by the unlawful and inequitable acts alleged in this complaint.

142.    Defendants' financial benefits are traceable to Plaintiff's and Class members' overpayments for Aggrenox.

143.    Plaintiff and Class members have conferred an economic benefit upon the Defendants in the nature of profits resulting from unlawful overcharges, to the economic detriment of Plaintiff and Class members.

144.    It would be futile for Plaintiff and Class members to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly purchased Aggrenox, as those intermediaries are not liable and would not compensate Plaintiff and Class members for Defendants' unlawful conduct.

145.    The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for Aggrenox is a direct and proximate result of Defendants' unlawful practices.

146.     The financial benefits Defendants derived rightfully belong to Plaintiff and Class members, who paid anticompetitive prices that inured to Defendants' benefit.

147.     It would be inequitable under unjust enrichment principles under the laws of each of the states in the United States and the District of Columbia and Puerto Rico for Defendants to retain any of the overcharges Plaintiff and Class members paid for Aggrenox that were derived from Defendants' unfair and unconscionable methods, acts, and trade practices.

148.     Defendants are aware of and appreciate the benefits bestowed upon them by Plaintiff and the Class.

149.     Defendants should be compelled to disgorge all unlawful or inequitable proceeds they received in a common fund for the benefit of Plaintiff and Class members.

150.     A constructive trust should be imposed upon all unlawful or inequitable sums the Defendants received that are traceable to Plaintiff and Class members.

151.     Plaintiff and Class members have no adequate remedy at law.

152.     As a successor in interest to Barr, Teva is liable for all of Barr's anticompetitive conduct in connection with Aggrenox.  And by joining an ongoing unlawful agreement to restrain trade, Teva is liable for all conduct that occurred prior to the date on which it joined the ongoing unlawful course of conduct.  In addition, Teva is liable for its own unlawful conduct.

## XII.    DEMAND FOR JUDGMENT

WHEREFORE, Plaintiff, on its own behalf and on behalf of the proposed Class, demands a judgment that:

A.     Determines that this case may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3), directs that reasonable notice of this case be given to class members under Rule 23(c)(2), and declares that Plaintiff is a proper representative of the Class;

B.      Declares that Defendants' conduct violated Section 1 of the Sherman Act, the other statutes set forth above, and the common law of unjust enrichment;

C.      Enjoins Defendants from continuing their illegal activities;

D.      Enters joint and several judgments against Defendants and in favor of Plaintiff and the Class;

E.      Grants Plaintiff and the Class equitable relief in the nature of disgorgement, restitution, and the creation of a constructive trust to remedy the Defendants' unjust enrichment;

F.      Awards Plaintiff and the Class damages and, where applicable, treble, multiple, punitive, and other damages, in an amount to be determined at trial, including interest;

G.      Awards Plaintiff and the Class their costs of suit, including reasonable attorneys' fees as provided by law; and

H.      Grants such further relief as the Court deems just.

**XIII.   JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff, demands a trial by jury on all issues so triable.


Dated:  April 1, 2014                              Respectfully submitted,

                                                  **SPECTOR ROSEMAN KODROFF**
                                                  **& WILLIS, P.C.**


                                                  /s/      Jeffrey L. Kodroff
                                                  Jeffrey L. Kodroff, Esquire
                                                  John A. Macoretta, Esquire
                                                  William Caldes, Esquire
                                                  SPECTOR ROSEMAN KODROFF
                                                  & WILLIS, P.C.
                                                  1818 Market Street – Suite 2500
                                                  Philadelphia, PA   19103

Telephone:  (215) 496-0300
Facsimile:  (215) 496-6611
jkodroff@srkw-law.com
jmacoretta@srkw-law.com
bcaldes@srkw-law.com


Christian M. Sande, Esquire
CHRISTIAN SANDE LLC
310 Clifton Avenue – Suite 300
Minneapolis, MN   55403-3218
Telephone:  (612) 387-1430
Facsimile:  (612) 677-3078
Christian@christiansande.com